IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 20, 2007

## STATE OF TENNESSEE v. JEFFERY McCLENNON MORRIS

Direct Appeal from the Circuit Court for Sevier County
Nos. 9125, 9129, 9156      Rex Henry Ogle, Judge

No. E2006-00524-CCA-R3-CD - Filed March 14, 2007

The defendant, Jeffery McClennon Morris, was convicted of aggravated sexual battery, a Class B felony, as well as domestic assault and contributing to the delinquency of a minor, Class A misdemeanors. He was sentenced as a violent offender to fifteen years in the Department of Correction for the felony and concurrent sentences of eleven months and twenty-nine days for each misdemeanor. He raises three issues on appeal: (1) the sufficiency of the convicting evidence; (2) whether certain of his statements were admitted at trial in violation of Tennessee Rule of Criminal Procedure 16(a)(1)(A); and (3) the validity of his indictment for domestic assault. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

Steve McEwen, Mountain City, Tennessee (on appeal), and James W. Greenlee, Sevierville, Tennessee (at trial), for the appellant, Jeffery McClennon Morris.

Robert E. Cooper, Jr., Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Al Schmutzer, Jr., District Attorney General; and Nichole Bass, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

The indictment in this matter alleged that the defendant committed the domestic assault offense on April 1, 2002, and the remaining offenses on May 29, 2002.

**State's Proof**

At trial, the victim, C.K.,[1] testified that her birthday was August 1, 1989, making her twelve years old when the offenses took place. She said she had known the defendant, her mother's boyfriend, since she was "about four [years old]" and that he had lived with them until February 2002, when her mother told him "he had to leave" because he had just "got[ten] out of jail" and "was drinking again."

The victim stated that on April 1, 2002, the defendant came to her house to get some paint and supplies he kept in an outside storage building. She said that he asked her if she wanted to rent a movie and that she went with him "to the movie store," where they stayed "maybe five minutes, at the most." She said that he yelled at her on the way home and that when they arrived home, she went to her room and closed the door. Shortly thereafter, the defendant, who was drunk, "slammed the door open," told her he was "going to kick [her] ass," lifted up the footboard of her bed, and then slammed it up and down while she was sitting on it. Her mother entered the room and told the defendant to leave, and, while they were talking, the victim went into the bathroom. The victim said that the defendant then "kicked [the bathroom door] or whatever. But somehow he, like, hit the door. And I was leaning up against the back of it. And he, like, hit it. And it flew open and I fell against the bathtub and hit my – my side and, like, a part of my back." She said that the police then arrived and the defendant was arrested.

Regarding the events of May 29, 2002, the victim testified that she had been staying with a neighbor, Tina Tinker, while her mother and the defendant were visiting the defendant's sick sister. When her mother and the defendant arrived home that day, he came to Tinker's house and told the victim that her mother wanted her to come home. When she arrived home, the victim went to her room because the defendant told her that her mother was sleeping. He brought her a marijuana cigarette, which she smoked, and then asked her to go to the living room so he could braid her hair, and she complied. He told her to change her shirt so he could apply acne medication to her back, and the victim described the following sequence of events:

> So I went and I put a halter top on which ties around my neck and is open in the back. And he started putting [the medicine] on. And he started – he rubbed my back, he put it on my shoulders, and he put it, like, right here on my chest. And then he started rubbing lower and lower, and then he put his hand, like under – in my shirt.

> And he was, like, "It's okay, I changed your diaper. I've known you since you was little. It's okay."

> So I was, like, "Whatever." And then . . . he just started rubbing back up here and on my neck or whatever. And then he was in front of me and he was rubbing it on my chest right here. And then he just kind of pulled my shirt down, and then he put his lips, like, on my breast. And then he just kind of, like, put it on there and then, like, pulled it off.

---

[1] It is the policy of this court to refer to minor victims of sexual abuse by their initials only.

> And then I kind of pushed him. I was, like, "What are you doing?"
>
> And he just kind of looked at me, he was, like, "Don't tell nobody [sic]. And he went back in through the house.

She said that the defendant brought her another "joint" and said, "Here, smoke this for me." She started smoking it but refused to do so the way the defendant wanted, so he left. She said that she woke up her mother, told her what had happened, and they went to Tinker's house and called the police.

The victim confirmed that she had a "grudge against" the defendant as a result of the sexual assault and admitted that she wrote letters to another inmate in the same jail as the defendant, asking if he would "kick [the defendant's] ass." She also testified that the defendant had first introduced her to marijuana and that her mother did not approve of her smoking it. On cross-examination, the victim denied that the defendant "continuously got after [her] for smoking dope" and acknowledged that, after the defendant's arrest, she told a neighbor that she was glad he was gone. She also denied that the April 1 incident was the result of a fight that ensued when the defendant caught her smoking marijuana in her room.

The victim's mother, Regina King, testified that the defendant was her boyfriend and they had "lived together for a long time." She said that their relationship was "good sometimes and bad a lot" and that the defendant "liked to drink, and when he drank he was violent and . . . there was nothing you could do. You couldn't get away from him and he wouldn't quit doing it and it just kept getting worse instead of better." She said that the victim considered the defendant to be "her dad."

King testified that on April 1, 2002, the defendant, no longer living at her house, came to get his painting supplies out of a storage building. He took the victim to a video store and was "irate" when they returned thirty minutes later. He went into the victim's room, yelled at the victim, picked up her bed, and slammed it into a wall. King said that as she and the defendant struggled, the victim went into the bathroom, but the defendant kicked the bathroom door "apart," causing the victim to "fl[y] across the bathroom and against the bathtub." She said that the victim "was crying and . . . started throwing up" and that she "called 9-1-1 and laid the phone down." When the police arrived, the defendant argued with the officer and was eventually handcuffed outside. King said that the victim "just kept throwing up" and "had red marks on her side and her back, [and] on her arm where he had grabbed at her." The victim later received medical treatment at the emergency room.

As to the May 29, 2002, incident, King testified that at 4:30 a.m. she and the defendant left Cherokee, where they had been visiting his terminally ill sister, so that she could be at work at 6:00 a.m. When she arrived home from work later that day "about maybe 3:00 or 3:30" p.m., she went to bed. She felt like she had been asleep about two hours when the victim "came and woke [her] up" crying and "shaking all over." The victim told her that she and the defendant had smoked marijuana, that he had tried to kiss her, and that he had rubbed medication on her shoulders and "sucked on her breast." King said that before she and the victim could leave the house, the defendant returned from

buying beer and told her, "Ah, you can't believe anything from her," when confronted with the victim's assertions. After the victim "calmed down enough," they went to Tinker's house and called the police.

King said that later that night, the defendant called her "repeatedly, over and over and over" and that she could tell that "the more he drank the louder he got and the braver he got." Over defense counsel's objection, she testified that in one of his later phone calls he said:

> I've wasted enough of my time for you telling on me and having to go to jail. You know you're going to have to pay for that. If I have to go to jail for this, you're going to pay for the rest of your life . . . . I don't care what you think about it. I raised her. She's old enough to be fucking anyway. And daddy might as well get the first piece.

Officer David Finchum of the Sevierville Police Department testified that on April 1, 2002, he responded to a "9-1-1 hangup" at the victim's residence. When he got out of his vehicle, he heard arguing and fighting coming from inside the mobile home residence and "could see the walls going in and out." After he "beat on [the door] real hard," the defendant answered and told him, "[Y]ou don't have no [sic] reason to be here. Nobody called the law." Finchum entered the trailer and saw the victim "bent over . . . spitting up and stuff, and she was crying and everything." The defendant told Finchum that he was "correcting [his] child." Officer Finchum said that after he handcuffed the defendant outside, the defendant became violent and threatened to "kick my A-S-S."

Officer Finchum said that the victim

> was hurting real bad in her abdominal area. She had a bunch of red marks on her back, her left side, to be precise. And said she was hurting. And she was real red, like if you take somebody's skin, it's white skin, you smack them two or three times over and over, how red it gets, a cherry-red bruising.

He called an ambulance and later went to the hospital where the victim told him that the defendant had "kicked the [bathroom] door open or pushed the door open and she landed inside the tub."

Detective Eric Ramsey of the Sevierville Police Department testified that on May 29, 2002, he responded to a call about a possible sexual battery at the victim's residence. He confirmed that he took "out a charge of contributing to the delinquency of a minor" based on the victim's statement that the defendant "had given her marijuana and that they had smoked it."

**Defense Proof**

Diane Ford testified that she had known King and the defendant for several years and that "they argued a lot." She saw King and the defendant at her mother's ninetieth birthday party on March 29, 2002, and when she asked King where her children were, King said that "she had sent them down to the lake bottom to smoke" marijuana. Ford said that the defendant "got really angry"

because he did not want "those kids to be anywhere around" drugs. Ford stated that King told her that "she might as well give it to them as to – you know, them be out trying to buy it [sic]." According to Ford, the defendant lived with King between February and May 2002.

Investigator Max Russell of the Department of Children's Services testified that he interviewed the victim on May 31, 2002, and, based on that interview, signed "a petition for no contact" between the victim and the defendant. He said that the victim told him that the defendant had pulled down her halter top and kissed her breast.

Robert Keith "Bob" Rhodes,[2] who was incarcerated for possession of marijuana at the time of the defendant's trial, testified that the defendant lived with King and her two children in March, April, and May 2002 "[b]ecause we was [sic] good friends. I lived down the road next trailer door to him, in the trailer next-door to him." Rhodes said that he had heard King and the defendant "argue about dope" and that the defendant "didn't want [marijuana] around the kids or anything," but "[i]t didn't matter" to King.

Deputy Connie Montgomery of the Sevier County Sheriff's Department testified that he knew the defendant and King and believed that the defendant lived with King between February and May 2002 because the defendant was at King's residence every time he went there to "drop[] paint off."

The defendant testified that he had known King for fourteen years and the victim "[e]ver since she was probably about three [years old]" and that he had lived with them in February, March, and April 2002. He admitted that he had a drinking problem and a temper and agreed that his relationship with King was "stormy" at times. He denied that he had ever given marijuana to the victim but said he had taken it away from her.

The defendant said that on April 1, 2002, he and the victim had "a conflict" at Popcorn Video because when he asked her if she had enough money to rent the videos she had selected, she reached in her pocket and a "cigarette cellophane of marijuana . . . fell on the floor. And that made [him] enraged at her." He said that once they got home, a fight ensued between him, the victim, and King in which he shoved the victim but "didn't hit her." Asked if he caused the "red marks on her arms and side," the defendant responded, "I would say so."

The defendant testified that he went camping with King, her children, Rhodes, and Tinker the weekend before May 29, 2002, and that he and King argued about whether the children should be allowed to smoke marijuana. According to the defendant, he observed the children smoking marijuana, asked King to "[d]o something with it," and then "it turned into a conflict with the other people that was [sic] at the campground." On May 29, 2002, the defendant and King left his sister's house in Cherokee at 6:00 a.m. He took King to work and later picked her up, returning home at "about 3:30, quarter of 4:00" p.m., and King went to bed. He said that the victim was not home when he and King arrived, but she later came home while he was cleaning the kitchen. He said he

_____

[2]Rhodes lived with Tina Tinker, and the victim referred to them as her aunt and uncle.

was "in and out of the house all afternoon" while working on his car. At one point when he came into the house "to get something," he smelled marijuana. He asked King if she had been smoking marijuana and when she denied that she had, he pushed open the victim's door and found her smoking a marijuana cigarette. He and the victim started arguing, and he "got very angry" and "grabbed her" by the T-shirt. After the victim jerked away from him and went to the living room, the defendant "just went out the door and left . . . furious because she was smoking pot."

The defendant acknowledged that he put medicine on the victim's ankle but denied ever touching or kissing her breasts. He also denied talking to King on the telephone that evening, saying that he "called twice and . . . never did get an answer." On cross-examination, he acknowledged that he had two prior convictions for aggravated assault, one for domestic violence, and one for violating an order of protection.

## ANALYSIS

### I. Sufficiency of the Evidence

On appeal, the defendant argues that the evidence presented at trial was insufficient to support his convictions for contributing to the delinquency of a minor and aggravated sexual battery. In consideration of this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e); State v. Evans, 838 S.W.2d 185, 190–92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). This rule applies when the determination of guilt is based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (Tenn. 1963)). Additionally, a jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted

defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

To argue the insufficiency of the evidence regarding the offenses that occurred on May 29, 2002, the defendant points out that "[t]he State's proof . . . concerning these charges consisted solely of the testimony of [the victim] and Regina King." The defendant also highlights inconsistencies in their testimony, contends that the victim had various motivations to lie in order to incriminate him, and asserts that "[d]ue to overwhelming evidence that it was the [defendant] that adamantly disapproved of [the victim's] marijuana use, it makes it more plausible that the events occurred as [the defendant] described them and not as testified to by [the victim]."

The jury convicted the defendant of aggravated sexual battery, which is defined as:

[U]nlawful sexual contact with a victim by the defendant . . . accompanied by any of the following circumstances:

    (1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon;

    (2) The defendant causes bodily injury to the victim;

    (3) The defendant is aided or abetted by one (1) or more other persons; and

        (A) Force or coercion is used to accomplish the act; or

        (B) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless; or

    (4) The victim is less than thirteen (13) years of age.

Tenn. Code Ann. § 39-13-504(a) (2003). "'Sexual contact' includes the intentional touching of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6) (2003); see also Tenn. Code Ann. § 39-13-501(2) (2003) (including the "breast of a human being" within the definition of "intimate parts").

It is undisputed that the victim in this case was twelve years old at the time of the offense, and her testimony described a specific action taken by the defendant – rubbing and kissing her breasts – that a rational trier of fact could reasonably construe as being for the purpose of sexual arousal or gratification. See Tenn. Code Ann. § 39-13-504(a) (2003). Additionally, the testimony that the defendant provided the victim with and encouraged her to use marijuana could lead a reasonable trier of fact to convict him of contributing to the delinquency of a minor. See Tenn. Code

Ann. § 37-1-156 (2003). As such, viewed in the light most favorable to the prosecution, the evidence presented at trial is sufficient to support both convictions.

## II. Admissibility of Defendant's Statements

The defendant also argues that "[t]he trial court erred by allowing Regina King to testify about alleged oral statements made to her by [the defendant] when these statements had not been disclosed to [defense] counsel prior to trial." Specifically, he asserts that King's testimony that the defendant told her on the night of the sexual offense, "I don't care what you think about it. I raised her. She's old enough to be fucking anyway. And daddy might as well get the first piece," was inadmissible under Tennessee Rule of Criminal Procedure 16(a)(1)(A) because it was not disclosed to the defense prior to trial.

Tennessee Rule of Criminal Procedure 16(a)(1)(A) requires that:

> Upon a defendant's request, the state shall disclose to the defendant the substance of any of the defendant's oral statements made before or after arrest in response to *interrogation* by any person the defendant *knew* was a law-enforcement officer if the state intends to offer the statement in evidence at the trial.

Tenn. R. Crim. P. 16(a)(1)(A) (2006) (emphasis added). The defendant contends that the proper discovery requests were made, and "because [King] had consulted with and been interviewed by the police, she was acting as an agent for the police and these statements should have been disclosed pursuant to" this rule.

We disagree. The statement at issue fails to fall within the category of statements required by Rule 16(a)(1)(A) to be disclosed prior to trial for at least two reasons: (1) according to King's testimony, the statement was made when the defendant called to issue threats, not in response to any form of interrogation; and (2) the record does not show, nor does the defendant allege, that he made the statement when he *knew* King was working for the police. See State v. Mark A. Griffin, No. E2001-02006-CCA-R3-CD, 2003 WL 151196, at *10 (Tenn. Crim. App. Jan. 22, 2003), perm. to appeal denied (Tenn. May 19, 2003) (stating that "because the remarks in question were made by the [defendant] to a civilian and not to an officer during an interrogation, 'they are not excludable [by Tennessee Rule of Criminal Procedure 16(a)(1)(A)] because the state did not reveal them'") (quoting State v. Balthrop, 752 S.W.2d 104, 108 (Tenn. Crim. App. 1988)).

## III. Validity of the Defendant's Indictment for Domestic Assault

Additionally, the defendant asserts that his indictment for domestic assault charges him with two separate and distinct offenses and is therefore invalid for duplicity. The indictment reads in relevant part:

> The Grand Jurors . . . present that [the defendant] on or about April 1, 2002, . . . did unlawfully, intentionally, knowingly or recklessly cause bodily injury to Regina King . . . in violation of T.C.A. § 39-13-111, contrary to the statute, and against the peace and dignity of the State of Tennessee.

However, the victim's first name was handwritten above "Regina," which was not crossed out or marked through. As such, the defendant argues that "the indictment did not provide adequate notice of the charge against him since [the defendant] could not discern whether [it] intended to charge him with domestic violence against one or both Regina King and [the victim]."

Since the defendant's claims as to the indictment were raised neither at trial nor in the motion for new trial, they are waived. See Tenn. R. Crim. P. 12(b)(2), (f); Tenn. R. App. P. 3(e); State v. Maddin, 192 S.W.3d 558, 561 (Tenn. Crim. App. 2005) (stating that "[w]hen an issue is raised for the first time on appeal, it is typically waived") (citing State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996)). Regardless, we conclude the issue is without merit because an indictment that achieves its "overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." State v. Hammonds, 30 S.W.3d 294, 300 (Tenn. 2000).

We may review these claims only if they raise to the level of plain error. This doctrine provides that where necessary to do substantial justice, an appellate court may take notice of a "plain error" not raised at trial if it affected a substantial right of the defendant. Tenn. R. Crim. P. 52(b). In order to review an issue under the plain error doctrine, five factors must be present: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the defendant must have been adversely affected; (4) the accused must not have waived the issue for tactical reasons, and (5) consideration of the error is necessary to do substantial justice. See State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000) (adopting five factors set out in State v. Adkisson, 899 S.W.2d 626, 641 (Tenn. Crim. App. 1994)). "[A]n error would have to be especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." State v. Page, 184 S.W.3d 223, 231 (Tenn. 2006).

From our application of the plain error factors to the defendant's claims, it is apparent that they do not satisfy each requirement. First, as to what the record shows occurred in the trial court, we note that the defendant made no complaints before or during the trial or in his motion for new trial. In fact, it is clear, even from counsel's opening statement, that the defendant knew who the victim was, and the defendant admitted that he caused her injuries. Further, we cannot conclude that the defendant did not remain silent at the trial level about these claims as to the sufficiency of the indictment so that he could raise them on appeal, if he was convicted. Finally, as to whether we must consider these claims to do substantial justice, we conclude that it is not necessary that we do so. In fact, the trial record makes clear that the defendant was not confused as to who the victim was. The jury simply believed the State's proof and disbelieved that of the defense. Accordingly, these claims may not be considered as plain error.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE